UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

LIGHTHOUSE CHRISTIAN
ACADEMY INC.,

Plaintiff,

v. Case No. 3:26-cv-1377-MCR-HTC

JONATHAN KANZIGG and
MIDWAY FIRE DISTRICT,

Defendants.
______________________________/

REPORT AND RECOMMENDATION

In this action, Plaintiff Lighthouse Christian Academy Inc. ("Lighthouse") alleges Defendants Midway Fire District ("MFD") and its former Fire Chief, Jonathan Kanzigg, engaged in a campaign of retaliation in 2024 by conducting an unlawful search of its property, enforcing the fire code improperly, and making defamatory statements. Doc. 31. Lighthouse asserts the Defendants' conduct violated its First and Fourth Amendment rights, and constituted defamation and tortious interference under Florida law.

Defendants have moved to dismiss Lighthouse's amended complaint as a shotgun pleading and for failure to state a claim (Doc. 32), and Lighthouse responded in opposition (Doc. 37). After reviewing the parties' submissions and the relevant law, the undersigned concludes the motion should be GRANTED IN PART and

DENIED IN PART as follows: (1) the First Amendment claim against Kanzigg should be DISMISSED with prejudice based on qualified immunity; (2) the portion of the defamation claim that is based on Kanzigg's seventh, eighth, and tenth statements should be DISMISSED with prejudice because those statements are pure opinion; and (3) the motion should be DENIED as to the remaining claims.

## I. Background[1]

Lighthouse is a Florida non-profit corporation that operates a non-denominational private Christian school with campuses in Santa Rosa and Escambia Counties. MFD is an independent special fire control district created by the Florida legislature to provide fire suppression and related services within the Midway district of Santa Rosa County, which includes Lighthouse's main campus in Gulf Breeze.[2] Kanzigg served as MFD's Fire Chief during the events described in the amended complaint.

At Kanzigg's direction, MFD's Fire Marshal, Michael Osban, and nine MFD firefighters went to Lighthouse's Gulf Breeze campus on February 26, 2024, and searched two houses on the campus. At the time, twelve foreign exchange students from Brazil lived in each house; the students attended and played soccer at Lighthouse and paid around $14,000 per year for their education and housing.

[1] The following facts are taken from Lighthouse's amended complaint. Doc. 31.
[2] *See* Fla. Stat. § 191.008 (explaining the responsibilities and powers of independent special fire control districts).

Page 3 of 35

Although Lighthouse had previously asked MFD to conduct an annual fire inspection of its school in Gulf Breeze, MFD never inspected the school on February 26 and, instead, only inspected the houses. When MFD personnel arrived, they told Lighthouse's Vice President/Director, Colin Hendrickson, they were there to "see the houses" based on an anonymous call that Lighthouse was "harboring too many foreign kids in the houses." Osban demanded entry to both houses.

MFD personnel searched the houses without a warrant and without consent. After completing the search, MFD declared the houses were unsafe, posted "no occupancy" notices on them, and directed Lighthouse to relocate the foreign students by that afternoon. Lighthouse moved the students to a hotel "at substantial cost" and, later, to two private homes in Gulf Breeze owned by Lighthouse's President, Joanna Johannes.[3] Kanzigg and Osban also discussed contacting the Pensacola Fire Department to encourage it to take similar action against Lighthouse's campus in Pensacola.

On February 28, 2024, MFD issued inspection reports for the houses and declared that under the fire code one house was considered a "Lodging or Rooming House" and the other a "Dormitory"; those designations required Lighthouse to install expensive fire sprinkler systems in the houses. Johannes asked MFD whether

---

[3] Lighthouse contends Kanzigg had "long-standing animosity toward Lighthouse and its President, Joanna Johannes." Doc. 31 at ¶ 24.

the same rules were applied to VRBOs and Airbnbs and whether Lighthouse could avoid installing the sprinkler systems by limiting each house to eight students and finding host families for the rest of them. MFD refused, insisting the houses required an occupancy change and that no occupancy would be permitted until the sprinkler systems were installed. In an April 3, 2024 text exchange, Kanzigg and Osban: (1) admitted the students could have been housed in the houses in the arrangement suggested by Johannes without sprinkler systems; and (2) discussed "pushing" off an inspection that would have allowed the students to return to the houses.

Beginning on March 1, 2024, and over the course of several weeks, Lighthouse claims Kanzigg, Osban, and other MFD personnel engaged in a campaign of harassment and retaliation, which included: (1) generating negative news coverage about Lighthouse; (2) making false statements to news outlets and other public officials regarding Lighthouse and its foreign students; and (3) refusing to conduct timely inspections of Lighthouse property and a property Lighthouse was considering purchasing. Lighthouse maintains Kanzigg's and MFD's conduct resulted in the denial of a state funding request, a decrease in enrollment and associated tuition payments, the expenditure of money to install unnecessary sprinkler systems, and damage to its reputation.

Based on the foregoing, Lighthouse brings First and Fourth Amendment claims against both Defendants, as well as defamation and tortious interference

claims against Kanzigg. Lighthouse seeks compensatory and punitive damages, as well as declaratory relief.

## II. Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* However, conclusory allegations and legal conclusions couched as factual allegations are not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 681; *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

## III. Discussion

As set forth below, Lighthouse's amended complaint: (1) is not a shotgun pleading; and (2) plausibly alleges First and Fourth Amendment claims, as well as claims for defamation and tortious interference. However, Kanzigg is entitled to qualified immunity on the First Amendment claim against him, and three of the statements Lighthouse identifies as defamatory are pure opinion and not actionable.

### A. Shotgun Pleading

Defendants argue the amended complaint should be dismissed because it is a shotgun pleading that "suffers from the same defects" the Court identified in its prior

Order granting the motion to dismiss the original complaint. Doc. 32 at 4-6. The undersigned disagrees.

The Court found Lighthouse's original 81-page complaint was a shotgun pleading because it was "virtually impossible to know what claims [were] being alleged in certain counts . . . and which allegations of fact [were] intended to support certain counts." Doc. 27 at 7. Defendants argue the amended complaint still "does not clearly identify which specific acts form the basis of each cause of action" (Doc. 32 at 6), but they do not identify which counts they are unable to understand or explain how the counts are deficient. The amended complaint corrects the issues the Court previously identified by specifying: (1) what claim is being brought in each count; and (2) which factual allegations support the defamation and tortious interference claims. *See e.g.* Doc. 31 at ¶ 114 (listing the statements Lighthouse asserts are defamatory); *id.* at ¶¶ 127-128 (listing the paragraphs that allegedly support the tortious interference claim).

The Court also noted the original complaint was "needlessly long and 'replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action.'" Doc. 27 at 8. The amended complaint, excluding the attached exhibits, is only 36 pages long and it omits the immaterial allegations and images the Court found problematic. Doc. 31.

Nevertheless, Defendants argue the amended complaint "continues to rely upon conclusory characterizations in lieu of well-pled allegations establishing the essential elements of [its] causes of action." Doc. 32 at 5. However, this argument concerns whether the amended complaint states a claim, not whether it is a shotgun pleading.[4] *See* Doc. 32 at 6 (arguing the amended complaint does not "plausibly allege facts satisfying the required elements of the claims asserted"); *see also Iqbal*, 556 U.S. at 678-80 (explaining that determining whether a complaint states a claim involves identifying which allegations are conclusory and not entitled to the assumption of truth then considering whether the remaining well-pled factual allegations plausibly give rise to an entitlement to relief).

Based on the foregoing, the amended complaint gives "the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *See Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015). Thus, it should not be dismissed as a shotgun pleading.

**B. Fourth Amendment**

Lighthouse alleges the February 2024 search of its student housing violated the Fourth Amendment. The Fourth Amendment prohibits unreasonable searches

[4] Other statements made in this section of Defendants' motion confirm their argument is about whether Lighthouse's factual allegations support its claims. *See e.g.*, Doc. 32 at 7 ("The Amended Complaint largely substitutes new labels for previously rejected theories without pleading additional material facts sufficient to state viable claims."). That argument is addressed below.

and seizures. U.S. Const. amend. IV. That prohibition "applies to both commercial premises and private homes."[5] *Fuqua v. Turner*, 996 F.3d 1140, 1150 (11th Cir. 2021). "Traditional police searches as well as 'administrative inspections designed to enforce regulatory statutes' are within the Fourth Amendment's ambit." *Id.* at 1151 (quoting *New York v. Burger*, 482 U.S. 691, 699-700 (1987)).

Lighthouse alleges MFD personnel searched the houses without a warrant. Under the Fourth Amendment, warrantless searches are presumptively unreasonable, "subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967); *see also United States v. Rodriguez Perez*, 798 F. App'x 536, 539 (11th Cir. 2020) ("In most circumstances, [officials] must obtain a warrant supported by probable cause to justify a search under the Fourth Amendment."). Nevertheless, Defendants contend two exceptions to the warrant requirement are relevant here.

**i. Administrative Inspection**

First, they argue the searches were administrative inspections that did not require a warrant. "[A]n administrative inspection of a closely regulated business is

---

[5] The parties dispute whether the houses are commercial premises or residential houses for Fourth Amendment purposes. *Compare* Doc. 32 at 15 *with* Doc. 37 at 12. Considering Lighthouse is a corporation, was not "residing" in the houses, and was receiving money in exchange for allowing students to live in the houses, the undersigned finds the houses are more properly viewed as commercial premises. Also, Lighthouse cannot assert the Fourth Amendment rights of its students. *Cf. Crosby v. Paulk*, 187 F.3d 1339, 1345 n.10 (11th Cir. 1999) (plaintiffs "are precluded from asserting Fourth Amendment rights of third parties who were subject to searches because they were on the premises of [plaintiffs'] nightclubs when the administrative search occurred").

Page 9 of 35

a 'well-established exception to the warrant requirement' for a search."[6] *Crosby v. Paulk*, 187 F.3d 1339, 1346 (11th Cir. 1999) (quoting *Burger*, 482 U.S. at 712); *see also Bruce v. Beary*, 498 F.3d 1232, 1239 (11th Cir. 2007) ("The warrantless administrative inspection . . . remains an exception to the Fourth Amendment's general rule that a warrant—supported by probable cause and specifying what is to be seized—is required when law enforcement seeks to search private property."). A warrantless inspection of a pervasively regulated business can be reasonable, however, only if three criteria are met: (1) there must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made; (2) the warrantless inspections must be necessary to further the regulatory scheme; and (3) the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant. *Crosby*, 187 F.3d at 1346.

Defendants assert Lighthouse has failed to plead facts showing the MFD's search "fell outside the constitutionally recognized framework governing administrative inspections." Doc. 32 at 15-16. Defendants argue Fla. Stat. § 633.214 provides them "with the authority to conduct inspections, investigate civil

[6] An administrative search doctrine exists for businesses that are not closely regulated, but that doctrine does not apply here because there is no indication Lighthouse was afforded an opportunity for precompliance review. *See City of Los Angeles v. Patel*, 576 U.S. 409, 420 (2015) ("The Court has held that absent consent, exigent circumstances, or the like, in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker.").

Page 10 of 35

infractions, and issue citations." Doc. 32 at 22; Fla. Stat. § 633.214(1)(a) (defining "firesafety inspector" as an individual "assigned the duties of conducting firesafety inspections of buildings and facilities on a recurring or regular basis, investigating civil infractions relating to firesafety, and issuing citations").

However, while § 633.214 generally references the government's ability to conduct firesafety inspections, Defendants do not identify the specific laws which authorized the search here or explain why a private school should be considered a "closely regulated" business. *See Patel*, 576 U.S. at 424-25 (noting the Supreme Court has identified only four industries that qualify as closely regulated based on the inherent risks to the public welfare they pose (liquor sales, firearms dealing, mining, and running an automobile junkyard), and finding operating a hotel did not qualify).

Defendants also do not explain how the regulatory regime at issue passes constitutional muster or describe how the searches complied with that regime. *See Donovan v. Dewey*, 452 U.S. 594, 599 (1981) ("Inspections of commercial property may be unreasonable if they are not authorized by law" and "warrantless inspections of commercial property may be constitutionally objectionable if their occurrence is so random, infrequent, or unpredictable that the owner, for all practical purposes, has no real expectation that his property will from time to time be inspected by government officials."); *Bruce*, 498 F.3d at 1243 ("[T]he scope and execution of an

administrative inspection must be reasonable in order to be constitutional. Although a statute authorizing administrative searches may be constitutional, actual searches conducted under that authority may not.").

Moreover, Defendants have the burden of presenting evidence that an exception to the warrant requirement applies. *See Gill ex rel. K.C.R. v. Judd*, 941 F.3d 504, 523 (11th Cir. 2019) (explaining that "when a plaintiff asserts that the police conducted an unconstitutional warrantless search, and the government claims that its search was legal under an exception to the warrant requirement, the plaintiff meets its initial burden by demonstrating the absence of a search warrant" and, "at that point, it is the government that bears the burden of coming forward with evidence that an exception to the warrant requirement applied") (cleaned up and citation omitted). Thus, the undersigned cannot conclude the searches were valid administrative inspections at this time.[7]

**ii. Consent**

Second, Defendants argue Lighthouse has failed to allege facts showing it did not consent to the search. *See United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989) ("One of the well-established exceptions to the probable cause and warrant

---

[7] Defendants cite *Youngblood v. Fla. Dep't of Health*, 224 F. App'x 909 (11th Cir. 2007) to argue "that disagreement with the scope or propriety of an administrative inspection does not itself establish a Fourth Amendment violation." Doc. 32 at 18. However, the court in *Youngblood* determined no search occurred. *See Youngblood*, 224 F. App'x at 914 ("Defendants' acts constituted neither a search nor a seizure" because plaintiff admitted the officers and inspectors "did not search or seize anything on 16 May 2001"). Thus, the case has no application here.

requirements is a search which is conducted pursuant to voluntary consent.”). However, according to Lighthouse, MFD’s Fire Chief and nine uniformed MFD firefighters arrived at its Gulf Breeze campus and told its Vice President/Director that they were there to “see the houses” because of an anonymous call alleging Lighthouse was “harboring too many foreign kids in the houses.” The MFD personnel walked to one of the houses, demanded entry, and subsequently searched both houses.

These allegations are sufficient to plausibly suggest Defendants gained entry through a show of authority. *See United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991) (“cases in which police have used their position to demand entry have held that consent was not voluntary”); *Moore v. Pederson*, 806 F.3d 1036, 1049 (11th Cir. 2015) (“consent is not freely and voluntarily given when a person merely acquiesces to a claim of lawful authority”). Furthermore, like the administrative search exception, Defendants have the burden of establishing Lighthouse consented to the searches. *See Fuqua*, 996 F.3d at 1150 (noting defendant’s “argument improperly places the burden on [plaintiff] to show he did not consent to the search when in fact the burden rests with [defendant] to prove he did”).

Accordingly, the allegation that the searches were conducted without a warrant and without valid consent are sufficient to state a Fourth Amendment claim.

Page 13 of 35

### C. First Amendment

Lighthouse alleges a First Amendment retaliation claim against the Defendants. To establish a retaliation claim, a plaintiff must show: (1) it engaged in constitutionally protected speech or conduct; (2) it suffered adverse action that would likely deter a person of ordinary firmness from engaging in such speech or conduct; and (3) there was a causal relationship between the adverse action and the protected speech or conduct. *Trigo v. City of Doral*, 663 F. App'x 871, 874 (11th Cir. 2016) (citing *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005)). Defendants argue Lighthouse has failed to allege facts supporting any of these three elements, but the undersigned disagrees.

On the first element, Lighthouse alleges Defendants retaliated against it for enrolling foreign students, which is an exercise of its right to academic freedom. The Supreme Court has recognized "academic freedom" as a "special concern of the First Amendment" and indicated it includes a school's selection of its students. *See Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978) ("The freedom of a university to make its own judgments as to education includes the selection of its student body."); *see also Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring) (identifying "who may be admitted to study" as one of "the four essential freedoms of a university"). Thus, Lighthouse has plausibly

alleged its decision to enroll foreign students constituted protected conduct.[8] *See President & Fellow of Harvard Coll. v. U.S. Dep't of Homeland Sec.*, 788 F. Supp. 3d 182, 201-03 (D. Mass. 2025) (concluding Harvard's refusal to allow federal government to control its academic decisionmaking, including decisions regarding the admission of students, constituted protected conduct for a First Amendment retaliation claim).

Defendants argue Lighthouse has not established the second element because the allegedly adverse action "consists primarily of fire and code enforcement and related communications." Doc. 32 at 12 (arguing Lighthouse "continues to admit to requesting the annual fire inspection . . . and inviting Midway to [its] property" and "[c]onducting a fire inspection is a lawful regulatory activity, not an adverse action"). However, this mischaracterizes Lighthouse's allegations. Lighthouse admits it asked MFD to inspect its *school*, but it alleges MFD *unlawfully* inspected the *houses* instead.[9] Furthermore, Defendants gloss over other allegations related to

---

[8] The Court concluded the allegations in the original complaint did not plausibly suggest Lighthouse had engaged in expressive association protected by the First Amendment; instead, the Court found the allegations were suggestive of a commercial relationship between Lighthouse and its foreign exchange students. Doc. 27 at 10-13. Defendants argue Lighthouse cannot avoid the Court's prior conclusion by characterizing the same conduct as implicating its right to academic freedom as opposed to its right to expressive association. Doc. 32 at 11-12. However, the failure of a set facts to support one legal theory does not preclude the same set of facts from supporting a different legal theory.

[9] Defendants again cite *Youngblood v. Fla. Dep't of Health*, 224 F. App'x 909 (11th Cir. 2007), this time for the proposition that an official's "attempt to enforce a neutral and generally applicable law by inspecting property where a church operated a school did not violate the First Amendment." Doc. 32 at 13. However, that case is not helpful here because: (1) it addressed a free exercise claim rather than a retaliation claim; and (2) Defendants have not identified the law or regulation

the retaliation claim—namely, that Defendants defamed Lighthouse, forced them to install unnecessary sprinkler systems, and refused to conduct inspections in a timely manner. *See Echols v. Lawton*, 913 F.3d 1313, 1322 (11th Cir. 2019) ("After a plaintiff engages in protected speech, an official may retaliate with physical or economic harm, but he may also retaliate with injurious speech."). Thus, Lighthouse has plausibly alleged it suffered adverse action that would deter a person of ordinary firmness.

On the third element, Lighthouse has plausibly alleged the required causal connection. Defendants argue Lighthouse has pled only "legal conclusions," but Lighthouse alleges MFD personnel told Lighthouse they wanted to search the houses because of a complaint that Lighthouse was "harboring too many foreign kids in the houses." Doc. 31 at ¶ 17. And, some of Kanzigg's allegedly defamatory statements referenced Lighthouse's enrollment of foreign students. *See id.* at ¶ 36 (alleging Kanzigg: (1) told a legislative aide that Lighthouse was "illegally housing 31 foreigners from Portugal"; and (2) told a Santa Rosa County Commissioner that Lighthouse was "getting tax dollars for every student and they're from another country"). These allegations, coupled with the temporal proximity between the relevant events, are sufficient to infer Defendants' actions were motivated by

---

which authorized the search of the houses. *See Youngblood*, 224 F. App'x at 912-13 ("Under state law, the DOH conducts periodic and unscheduled inspections of school and food-service facilities.").

Lighthouse's enrollment of foreign students. Accordingly, Lighthouse has stated a First Amendment retaliation claim.

**D. Qualified Immunity**

Kanzigg argues, even if Lighthouse has alleged a constitutional violation, he is entitled to qualified immunity.[10] Qualified immunity shields government officials from liability unless they violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Myrick v. Fulton Cnty., Ga.*, 69 F. 4th 1277, 1297 (11th Cir. 2023). If the defendant official meets his initial burden of showing he was acting within the scope of his discretionary authority, the burden shifts to the plaintiff to show: (1) the defendant's conduct violated a constitutional right; and (2) the right violated was clearly established at the time of the alleged violation. *Id.*

To demonstrate he was acting within the scope of his discretionary authority, Kanzigg must show he was: (1) "performing a legitimate job-related function (that is, pursuing a job-related goal)"; (2) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). When assessing whether an official acted within his discretionary authority, courts "look to the general nature of the defendant's action, temporarily putting aside

[10] MFD cannot rely on a qualified immunity defense. *See Heggs v. Grant*, 73 F.3d 317, 319 n.5 (11th Cir. 1996) ("The qualified immunity defense does not extend to municipalities[.]").

the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Id.* at 1266.

Here, Kanzigg asserts he was acting as MFD's Fire Chief "at all relevant times in engaging in fire safety inspections . . . and in overseeing matters relating to fire protection and regulatory compliance."[11] Doc. 32 at 19-20. The undersigned agrees.

As Fire Chief, Kanzigg is responsible for supervising and managing the operations of MFD. *See* Fla. Stat. § 191.008(2) (stating the board shall prescribe the duties of a fire chief, "which shall include supervision and management of the operations of the district"). Conducting inspections and ensuring code compliance fall within the scope of his duties and communicating with officials and the media regarding those issues are reasonably related to those duties. *See Donald v. Norris*, 131 F.4th 1255, 1264 (11th Cir. 2025) ("If [an official's] course of action was reasonably related to, or within the 'outer perimeter' of his powers, then his action was within his discretionary authority."); *Echols*, 913 F.3d at 1319 (prosecutor's submission of letter to legislators was within scope of his discretionary authority when letter "addressed the public fisc and both a past prosecution and a potential future prosecution"). Based on the foregoing, the undersigned finds Lighthouse's

---

[11] Kanzigg also notes that Lighthouse alleges, "[a]t all times relevant to this action, Kanzigg was Midway's Fire Chief and in that capacity had the authority to and did make all the final policy decisions on behalf of Midway upon which this action is based." *See* Doc. 31 at ¶ 14.

§ 1983 claims are based on conduct and communications that fell within Kanzigg's discretionary authority as Fire Chief.[12]

Accordingly, Lighthouse has the burden of showing the rights Kanzigg allegedly violated were clearly established. Lighthouse "can show that a constitutional right was clearly established in three ways: (1) citing case law with indistinguishable facts that clearly establishes the constitutional right; (2) pointing to a broad statement of principle within the Constitution, statute, or case law that clearly establishes the constitutional right; or (3) alleging conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Myrick*, 69 F.4th at 1300.

According to the allegations in the amended complaint, Defendants conducted a warrantless search of two houses owned by Lighthouse, and the search did not qualify as an administrative inspection and was not supported by valid consent. Caselaw clearly establishes that, absent an exception, warrantless searches violate

---

[12] Lighthouse's only argument in response is that Kanzigg cannot establish he was acting within the scope of his discretionary authority because he "acted for personal reasons and not in pursuit of job-related goals." Doc. 37 at 17. However, as the Court previously noted (Doc. 27 at 14), Kanzigg's subjective motivations are irrelevant. *See Crawford-El v. Britton*, 523 U.S. 574, 588 (1998) ("[A] defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated. Evidence concerning the defendant's subjective intent is simply irrelevant to that defense."); *Swint v. City of Wadley, Ala.*, 51 F.3d 988, 995 (11th Cir. 1995) ("Although the cases sometimes refer to the doctrine of qualified 'good faith' immunity, the test is one of objective legal reasonableness, without regard to whether the government official involved acted with subjective good faith.").

the Fourth Amendment.[13] *See Katz*, 389 U.S. at 357 ("searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions"); *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978) ("This Court has already held that warrantless searches are generally unreasonable, and that this rule applies to commercial premises as well as homes."); *see also Bruce*, 498 F.3d at 1250 (concluding officers were not entitled to qualified immunity because "it was clearly established that an administrative search must be reasonable under the circumstances and may not exceed its limited scope"). Thus, Kanzigg is not entitled to qualified immunity on the Fourth Amendment claim.

As for the First Amendment claim, Lighthouse attempts to show Kanzigg's conduct violated clearly established law under all three methods. Under the first method, Lighthouse contends cases demonstrate "[t]he right to academic freedom is well-established" and "campaigns of retaliation and intimidation against a plaintiff

[13] Evidence may later show it was reasonable for MFD personnel to believe they were conducting a valid administrative inspection or had consent to search, but the Court is limited to considering the allegations in the amended complaint on a motion to dismiss. *See Fuqua*, 996 F.3d at 1154 (concluding, on appeal from summary judgment ruling, "that a reasonable officer in Collier's position could have believed he had Fuqua's effective consent to enter The Pig to conduct an inspection"); *Brown v. City of Atlanta*, 778 F. App'x 728, 730 (11th Cir. 2019) (concluding, on appeal from summary judgment ruling, that "the law [was] not clearly established that the administrative inspection exception to the warrant requirement would not be applicable under the circumstances with which the Officers were faced").

and retaliatory defamation are clearly unlawful."[14] Doc. 37 at 18. However, the cases cited for these propositions are distinguishable from the present case[15] and Lighthouse does not cite any cases from the Supreme Court, the Eleventh Circuit, or the Florida Supreme Court where the court concluded an official violated the First Amendment by taking adverse action against an educational institution for exercising its right to academic freedom. Thus, regardless of whether caselaw clearly establishes that defamation or a campaign of harassment can constitute the adverse action necessary to sustain a retaliation claim, a reasonable person in Kanzigg's position would not have been on notice that his actions violated clearly-established First Amendment law. *See Gaines v. Wardynski*, 871 F.3d 1203 (11th Cir. 2017) (concluding school superintendent was entitled to qualified immunity because it was not clearly established that it violated the First Amendment to take

[14] The right to academic freedom and its precise contours are not well defined. Some courts have questioned the existence of the right, at least in cases where professors invoked it to challenge restrictions on their speech. *See Bishop v. Aronov*, 926 F.2d 1066, 1070 (11th Cir. 1991) ("Though we are mindful of the invaluable role academic freedom plays in our public schools, particularly at the post-secondary level, we do not find support to conclude that academic freedom is an independent First Amendment right."); *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1236 (N.D. Fla. 2022) ("To be clear, though, the Supreme Court has never definitively proclaimed that 'academic freedom' is a stand-alone right protected by the First Amendment.").

[15] *Bennett v. Hendrix*, 423 F.3d 1247 (11th Cir. 2005) and *Echols v. Lawton*, 913 F.3d 1313, 1322 (11th Cir. 2019) involved suits brought by individuals, not educational institutions, and the protected activity included supporting a referendum and petitioning the government for compensation for wrongful convictions, not enrolling foreign students. Also, *Bakke* discussed academic freedom as it relates to a university, not a secondary school like Lighthouse. *See Bakke*, 438 U.S. at 312.

adverse action against a public employee because of her father's protected speech or her familial relationship with her father).

Lighthouse also asserts Kanzigg's "alleged conduct … clearly satisfies the second and third" methods (Doc. 37 at 20), but that conclusory assertion is not enough for Lighthouse to meet its burden. "Cases do not often arise under the second and third methods," *Gaines*, 871 F.3d at 1209, and the Eleventh Circuit has noted the general principle that retaliation for the exercise of constitutional rights is a clearly established violation "is too broadly stated" to control the qualified immunity inquiry. *See Echols*, 913 F.3d at 1324 ("True, 'it is settled law that the government may not retaliate against citizens for the exercise of First Amendment rights.' But that general principle does not resolve with 'obvious clarity' that defamation may constitute retaliation in violation of the First Amendment."). Also, Lighthouse has not alleged conduct so egregious the First Amendment was clearly violated, even in the total absence of case law. *See Gaines*, 871 F.3d at 1208 (superintendent passing teacher over for promotion because her father had criticized him and school board about a matter of public concern was "not so egregious as to violate the First Amendment on its face with respect to her constitutional rights, and because there are no 'broad principles' in case law clearly establishing that every reasonable official in that situation would know that the challenged conduct would violate her First Amendment rights").

Accordingly, Lighthouse has not met its burden of showing Kanzigg should have known it violated the First Amendment to take adverse action against an educational institution for exercising its "academic freedom." Thus, the First Amendment claim against Kanzigg should be dismissed. *See id.* at 1210 ("It is particularly difficult to overcome the qualified immunity defense in the First Amendment context.").

**E. Municipal Liability**

Lighthouse also brings First and Fourth Amendment claims against MFD. A municipality like the MFD "cannot be held vicariously liable under § 1983 for constitutional violations committed by its officers." *Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016). Instead, a plaintiff must show the municipality had a policy, custom, or practice that caused the violation of its rights. *Id.*; *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) (liability is limited to "acts which the municipality has officially sanctioned or ordered").

MFD argues Lighthouse has not stated a municipal liability claim because it does not allege "a pattern of similar constitutional violations that is so widespread as to have the force of law." Doc. 32 at 24. However, a municipality may be liable for a single action of an individual when "the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur*, 475 U.S. at 481 ("[W]here action is directed by those who establish governmental

policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly.”).

Here, Lighthouse claims Kanzigg served as a final policymaker for MFD and, thus, his conduct—ordering inspections, enforcing the fire code, and making defamatory statements—is attributable to MFD. Lighthouse alleges Kanzigg was MFD’s Fire Chief and “had the authority to and did make all the final policy decisions on behalf of Midway upon which this action is based.” Doc. 31 at ¶ 14. State law suggests a fire chief supervises and manages the operations of a fire district like MFD. *See* Fla. Stat. § 191.008(2) (stating the board shall prescribe the duties of a fire chief, “which shall include supervision and management of the operations of the district”). Also, MFD does not address the allegation that Kanzigg was a final policymaker or identify any laws or rules which suggest there was an opportunity for meaningful review of Kanzigg’s decisions regarding inspections or communications with the media or other officials.[16] Thus, Lighthouse’s allegations are sufficient to state a First and Fourth Amendment claim against MFD.

[16] Defendants also argue an allegation that Kanzigg acted outside the authority conferred by Chapter 633 is “internally inconsistent” with an allegation that Kanzigg’s acts constitute official municipal policy. Doc. 32 at 24-25. However, those allegations are not mutually exclusive. A final policymaker’s conduct can violate state law yet still be attributable to a municipality.

Page 24 of 35

### F. Defamation

Lighthouse alleges Kanzigg is liable for defamation. Under Florida law, defamation has five elements: "(1) publication; (2) falsity; (3) the statement was made with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) the statement must be defamatory." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) (citing *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008)). "[A] defamatory statement is one that tends to harm the reputation of another by lowering him or her in the estimation of the community or, more broadly stated, one that exposes a plaintiff to hatred, ridicule, or contempt or injures his business or reputation or occupation." *Rapp*, 997 So. 2d at 1108-09.

Lighthouse identifies ten statements Kanzigg made to officials and the media as defamatory:

1. Lighthouse was "illegally housing 31 foreigners from Portugal," including "21 living in one small house"
2. Lighthouse had the Exchange Students in "Trafficking like conditions" and left them "completely on their own,"
3. Lighthouse was getting money from the State for the kids to attend school
4. Lighthouse moved the Exchange Students to a "3000 square-foot house with 21 kids living in it,"
5. Lighthouse was "getting tax dollars for every student and they're from another country"
6. "The worst part is tax dollars are paying for these kids to be here" and that Lighthouse "get[s] money from the state for each student … "
7. "There are too many people living at the home . . . it's far beyond occupancy laws and is posing a serious threat to the community"

8. Midway "is now accountable for [the Exchange Students'] wellbeing," and "[s]ince we have knowledge of it, we are absolutely 100% responsible to look after these kids"
9. "[T]his isn't the first incident like this with Lighthouse Christian Academy. Two months ago, they were forced to move students in Pensacola from unsafe conditions."
10. "[T]here had been over 20 students living there with little to no supervision."

Doc. 31 at ¶ 114.

**i. Pure Opinion**

Kanzigg argues these statements cannot support a defamation claim because they are "pure opinion," but he specifically addresses only the seventh, eighth, and tenth statements in his motion.[17] Doc. 32 at 27-29. Thus, the undersigned will do the same.

"Under Florida law, a defendant publishes a 'pure opinion' when the defendant makes a comment or opinion based on facts which are set forth in the publication or which are otherwise known or available to the reader or listener as a member of the public." *Turner*, 879 F.3d at 1262. "[S]tatements of pure opinion are protected from defamation actions by the First Amendment." *Id.*

[17] Some of the other statements clearly do not constitute pure opinion. For example, statements regarding whether Lighthouse received money from the government for enrolling the foreign students and whether Lighthouse had previously been forced to relocate students in Pensacola are "readily capable of being proven true or false." *See Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 697 (11th Cir. 2016).

Kanzigg's seventh statement appeared in an article published by WEAR News on March 6, 2024, regarding the foreign students' living arrangements after they moved to the homes owned by Johannes in Gulf Breeze.[18] The article indicated: (1) "video shared with WEAR News from a neighbor shows more than 20 children getting off a school bus and going into a single home on Refuge Circle"; (2) "WEAR News has learned at least 23 students are living in the 3,000 square-foot home"; (3) WEAR News spoke with a Lighthouse official who stated only 12 people lived at the Refuge Circle home; and (4) a student at the home told WEAR News more than 20 people lived there. The article also relayed Kanzigg's commentary on the situation: "Kanzigg said there are too many people living at the home. He believes this issue goes beyond a nuisance for neighbors – it's far beyond occupancy laws and is posing a serious threat to the community."

Although Lighthouse claims otherwise (Doc. 37 at 27), the facts Kanzigg's commentary is based on (i.e., the WEAR News reporting regarding the number of students living at the home) are clearly set forth in the article; thus, the commentary

[18] *See* https://weartv.com/news/local/concerns-raised-about-overcrowded-house-of-foreign-students-in-gulf-breeze. The Court may consider the articles referenced in the amended complaint under the incorporation-by-reference doctrine. *See Johnson v. City of Atlanta,* 107 F.4th 1292, 1300 (11th Cir. 2024) ("[W]hen resolving a motion to dismiss . . . , a court may properly consider a document not referred to or attached to a complaint under the incorporation-by-reference doctrine if the document is (1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged.").

is pure opinion.[19] *See From v. Tallahassee Democrat, Inc.*, 400 So. 2d 52, 57 (Fla. 1st DCA 1981) ("Pure opinion occurs when the defendant makes a comment or opinion based on facts which are set forth in the article or which are otherwise known or available to the reader or listener as a member of the public."); *Reed v. Chamblee*, 2023 WL 6292578, at *20 (M.D. Fla. Sept. 27, 2023) (commentary about golfer's conduct as "blatantly illegal" and "an obvious violation" constituted protected opinion because writer provided "the necessary factual background on which he bases his opinions"). Moreover, the sentence with the "occupancy laws" and "threat" language was prefaced with "[Kanzigg] believes." This cautionary language signals to a reasonable reader that the commentary reflected Kanzigg's opinion. *See Turner*, 879 F.3d at 1263 ("a court should construe statements in their totality, with attention given to any cautionary terms used by the publisher in qualifying the statement"); *Borislow v. Canaccord Genuity Grp. Inc.*, 2014 WL 12580259, at *4 (S.D. Fla. June 27, 2014) ("the use of the phrase 'we believe' shows that the author is presenting his opinion regarding the reason for that drop").

---

[19] Lighthouse argues statements of opinion are still actionable when the facts underlying the opinion are false. Doc. 37 at 27. However, while Lighthouse alleges 20 students never lived in the Refuge Circle house (Doc. 31 at ¶¶ 31, 42), they do not allege WEAR News: (1) falsely reported viewing the video showing more than 20 students exit a bus and enter the home; or (2) fabricated the statement that a student at the home told them more than 20 people lived there. Also, the article presented Lighthouse's assertion that only 12 students lived at the house. Thus, Lighthouse has not shown the article inaccurately presented the facts and it has not shown Kanzigg knew or should have known the facts presented were false.

Kanzigg's eighth statement—MFD "is now accountable for [the students'] wellbeing," and "[s]ince we have knowledge of it, we are absolutely 100% responsible to look after these kids"—appeared in the same article. It is likewise an expression of pure opinion because it simply reflects a subjective view regarding the MFD's responsibilities to members of the public. While Lighthouse notes an MFD commissioner later told Kanzigg "we are not responsible for these kids," responsibility is an amorphous concept, and whether the MFD is "accountable" or "responsible" for the students is not readily capable of being proven true or false. *Cf. Reed*, 2023 WL 6292578, at *16 ("[W]hether a person 'aligns' himself with another is an amorphous expression that cannot be proven or disproven."). Moreover, the assertion that MFD is "absolutely 100% responsible" for looking after the students is rhetorical hyperbole because it could not reasonably be interpreted as indicating the MFD was assuming complete responsibility for the care of the students. *See Flynn v. Wilson*, 398 So. 3d 1103, 1111-12 (Fla. 2d DCA 2024) (noting the First Amendment protects statements that cannot reasonably be interpreted as stating actual facts because exaggeration and non-literal commentary have become an integral part of social discourse).

Kanzigg's tenth statement—"there had been over 20 students living there with little to no supervision"—appeared in a different article published by WEAR News

on March 7, 2024.[20] However, the statement was presented with the same context because the March 7 article: (1) referenced and included a hyperlink to the March 6 article; and (2) indicated WEAR News interviewed neighbors who said some students moved out after the March 6 story aired but that there were still more than a dozen students seen living there. Kanzigg's statement that the students had "little to no supervision" is a subjective assessment that amounts to pure opinion.[21] In addition, to the extent Lighthouse takes issue with the assertion that 20 students lived at the house rather than 12, that distinction does not support a defamation claim because the gist of Kanzigg's statement remains the same. *See Jeter v. McKeithen*, 2014 WL 4996247 at *3 (N.D. Fla. Oct. 7, 2014) (dismissing defamation claim because "regardless of whether K.J. was alleged by the police to have bullied 'dozens' of victims or 'at least one' victim, the statement communicates the same 'gist' to the audience").

Based on the foregoing, the undersigned finds the three statements discussed above cannot support a defamation claim.

---

[20] *See* https://weartv.com/news/local/parent-details-lighthouse-christian-academys-alleged-faults-amid-crowded-home-complaints.

[21] Lighthouse argues Kanzigg's "little to no supervision" statement "is demonstrably false because the Exchange Students were living in the new Hope Road Homes 'under the supervision of resident advisors in accommodations reviewed and approved by their parents' and 'were always under the supervision of resident advisors.'" Doc. 37 at 27-28. However, the article clearly shows the supervision comment was made in reference to the house on Refuge Circle, not the houses on New Hope Road. Moreover, the statement is not capable of being proven false because an individual's view regarding what constitutes "little" supervision is inherently subjective.

### ii. Privilege

Kanzigg also suggests his statements are protected by Florida's "fair comment" privilege because he made them "regarding the concerns of [Lighthouse] as an interested person in the Pensacola community." Doc. 32 at 29-31. However, as the Court previously told Kanzigg (Doc. 27 at 22), the "fair comment" privilege is no longer relevant to an analysis of defamation claims. *See Rendón v. Bloomberg L.P.*, 2025 WL 1482420, at *5 (11th Cir. May 23, 2025) ("Florida did recognize a 'fair comment qualified privilege' for suits by public figures, but it 'was always defeated by express malice, a lesser standard than' actual malice. As a result, that 'qualified' privilege is superseded by the First Amendment's even stricter actual malice requirement as announced by the Supreme Court.") (quoting *Miami Herald Publ'g Co. v. Ane*, 458 So. 2d 239, 241-42 (Fla. 1984)).

### iii. Florida's Anti-SLAPP Statute

Lastly, Kanzigg argues Lighthouse's defamation claim should be dismissed under Florida's anti-SLAPP[22] statute. Doc. 32 at 31-35; *see also* Fla. Stat. § 768.295. The statute prohibits a person from filing a cause of action "against another person or entity without merit and primarily because such person or entity has exercised the constitutional right of free speech in connection with a public issue[.]" Fla. Stat. § 768.295(3). However, because Lighthouse has stated a plausible defamation claim

[22] "SLAPP" stands for strategic lawsuits against public participation.

against Kanzigg based on at least some of his statements, this case is not "without merit" and not subject to dismissal under the anti-SLAPP statute. *Cf. Bongino v. Daily Beast Co., LLC*, 477 F. Supp. 3d 1310, 1322 (S.D. Fla. 2020) ("Because Plaintiff's suit fails to state a claim for defamation, it was without merit under Florida Statute § 768.295(3).").

**G. Tortious Interference**

Lighthouse claims Kanzigg is liable for tortious interference. "Four elements are required to establish tortious interference with a contractual or business relationship: (1) the existence of a business relationship or contract; (2) knowledge of the business relationship or contract on the part of the defendant; (3) an intentional and unjustified interference with the business relationship or procurement of the contract's breach; and (4) damage to the plaintiff as a result of the interference." *Howard v. Murray*, 184 So. 3d 1155, 1166 (Fla. 1st DCA 2015).

**i. Single Action Rule**

Kanzigg argues the tortious interference claim should be dismissed because it is based on the same conduct as Lighthouse's defamation claim and, thus, is barred by the "single action rule." Doc. 32 at 35-37. Courts have not always uniformly applied the "single action rule." *See Emergency Recovery, Inc. v. Gov't Emps. Ins. Co.*, 773 F. Supp. 3d 1304, 1314-20 n.4 (M.D. Fla. 2025) (discussing the history of the single action rule and noting federal district courts in Florida "remain deeply

Page 32 of 35

divided about the correct application" of the rule). Some courts conclude the rule categorically prevents a plaintiff from basing another tort on the same statements supporting a defamation claim, while other courts find the rule only prevents a plaintiff from recasting a defamation claim as another tort to avoid an affirmative defense to a defamation claim. *Compare Int'l Security Mgmt. Grp., Inc. v. Rolland*, 271 So. 3d 33, 48 (Fla. 3d DCA 2018) ("Florida's single publication/single action rule precludes the recasting of defamation claims as additional, distinct causes of action in tort if all of the claims arise from same defamatory publication.") *with Emergency Recovery*, 773 F. Supp. 3d at 1320 (concluding "where a defendant has not successfully invoked an affirmative defense to defamation, the single action rule presents no bar to a plaintiff's tortious interference claim premised on the same publication").

Here, the single action rule does not require dismissal of the tortious interference claim. First, Lighthouse's tortious interference claim is based not only on allegedly defamatory statements but includes other conduct such as the search and forced relocation of the students. Second, as many courts have emphasized, the purpose of the single action rule is "to prevent plaintiffs from *circumventing a valid defense* to defamation." *Callaway Land & Cattle Co., Inc. v. Banyon Lakes C. Corp.*, 831 So. 2d 204, 208 (Fla. 4th DCA 2002) (emphasis added and citation omitted). Because Lighthouse has stated defamation claim as to some of Kanzigg's statements,

the Court has not determined a valid defense defeats the claim. *See Emergency Recovery*, 773 F. Supp. 3d at 1320. Thus, dismissal of the tortious interference claim is not warranted.

**ii. Knowledge of Business Relationships**

Kanzigg also argues Lighthouse "fails to properly allege" he had knowledge of Lighthouse's business relationships. Doc. 32 at 37. However, Kanzigg knew Lighthouse operated a private school, so it is reasonable to infer he also knew Lighthouse had a "business relationship" with its students. Furthermore, Lighthouse describes specific communications Kanzigg had regarding the amount the students were paying for tuition and boarding. Doc. 31 at ¶ 36(D). Because Lighthouse has plausibly alleged Kanzigg had knowledge of its business relationships, the tortious interference claim is not subject to dismissal on that basis.

**H. Punitive Damages**

Lastly, Kanzigg argues the request for punitive damages in Counts I and V should be stricken because Lighthouse has failed to allege facts to support such damages.[23] However, the undersigned disagrees.

"[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or

[23] Kanzigg also argues the request for punitive damages in Count II should be stricken, but that argument is moot because, as discussed above, Kanzigg is entitled to qualified immunity on the First Amendment claim.

intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). And, under Florida law, a defamation plaintiff may recover punitive damages if they can establish actual malice. *See Cable News Network, Inc. v. Black*, 374 So. 3d 811, 816 (Fla. 4th DCA 2023).

Considering Lighthouse alleges Kanzigg ordered MFD personnel to conduct a warrantless search of its property, and such a search, as currently described, violates clearly established law, the undersigned cannot conclude as a matter of law that the conduct underlying the Fourth Amendment claim does not involve reckless indifference to Lighthouse's rights. Similarly, Lighthouse's allegations plausibly suggest Kanzigg made certain defamatory statements with reckless disregard for their truth. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 348 (1974) ("States may not permit recovery of . . . punitive damages . . . when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth."). Thus, at this early stage, Kanzigg's request to strike the request for punitive damages should be denied.

## IV. Conclusion

Accordingly, it is RECOMMENDED that:

1. Defendants' motion to dismiss (Doc. 32) be GRANTED IN PART and DENIED IN PART, as follows: (a) the First Amendment retaliation claim against

Kanzigg should be DISMISSED with prejudice based on qualified immunity; (b) the portion of the defamation claim that is based on Kanzigg's seventh, eighth, and tenth statements should be DISMISSED with prejudice because those statements constitute pure opinion; and (c) the motion to dismiss should otherwise be DENIED.

2. Defendants be given fourteen (14) days to file an answer to the amended complaint.

3. The stay on discovery (Doc. 27) be lifted, and the Court enter a final scheduling order based on the parties Rule 26(f) report (Doc. 21).

At Pensacola, Florida, this 21st day of September, 2026.

/s/ Hope Thai Cannon

**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**

NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations must be filed within **fourteen (14) days** of the date of the Report and Recommendation. Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control. An objecting party must serve a copy of its objections upon all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. See 11th Cir. Rule 3-1.